Thank you, Your Honors. I'm Ted Scott for Petitioner, Intervenor, Respondent, Chino Valley Medical Center. I do want to note that my client is in the room, Mr. Brady Mitchell, AGC, for the parent company. I'd like to reserve five minutes for rebuttal, and as I have advised Ms. Sheehy and Mr. Spillers, when I'm back at my table, if I'm standing up, it's because it helps me see what's written down on the desk. So I apologize for that in advance. No apology necessary, but thank you for alerting me to that. Otherwise, we look over, what's he doing standing up there? Exactly. I'm not meant to lurk or stalk when I do that. Understood. There are three primary – well, we certainly appreciate that the Court has specific questions. That's what I'm here for, is to respond to those questions. I do have a few primary issues that I would like to discuss. The first has to do with the Board's finding of an unfair labor practice based on the subpoenas that were served on the employees and union to obtain evidence relevant to CVMC's challenge to the union's use of charge nurses to organize employees. That determination by this Court involves straight legal issues. The facts are undisputed. The second primary issue goes to the Board's finding that CVMC illegally terminated Mr. Ronald Magsino due to his union activities. That determination by the Board's findings are supported by substantial evidence. All right, so let's talk about service of the subpoena. Why isn't that an end run around the confidentiality protections of Section 7? Well, it is not an end run around that because it was designed not to disclose or to obtain information with respect to employees organizing activities independent of the involvement of the charge nurses in that activity. And in that regard, I think it's important for the Court to appreciate that there are four different requests at issue with respect to the Board's findings. And with respect to every one of those requests, the Administrative Law Judge permitted documents to be, or I should say required at least some documents to be provided to the employer for its use in litigating the election challenges. Is it an overbroad subpoena request, though? Oh, it may be. As construed by the Administrative Law Judge, it was exactly why there is the statement in the subpoena that all documents should be produced to the Administrative Law Judge for an in-camera inspection. The employer in its counsel, which was me, was well aware of the Board's issues relating to confidentiality, and we tried very, very hard to respect the Board's rules and law in that area by including in the subpoena the direction to employees that they need not produce those records to the employer. The employer was only going to get those records once the ALJ looked at them and determined whether or not they should be produced for purposes of the actual hearing. But why include that request at all within the scope of the subpoena? If it's only to challenge the election objection, why have such a broad subpoena be issued? Well, those reasons were explained in the back and forth with the Administrative Law Judge at the representation hearing, where those subpoenas were served in look at one of the requests went to authorization cards signed by supervisors, the charge nurses, those were ordered produced. With respect to the other items, the employer explained to the Administrative Law Judge during that hearing why those items were included and what it hoped to obtain. And I think the analogy here is in a situation where the employer was trying to find evidence that the charge nurses were involved. So if the employer requests documents that, for instance, the response may be, oh, we don't have those. Then you're expecting the party to look at the documents themselves, and then you have to rely on that party to have fully and fairly responded to that subpoena. It's really no different than a situation where if you're in a wage and hour litigation and the plaintiff requests time records, they're entitled to all the time records. They're not required to say time records that show off the clock work. And that's very similar to the situation we have here. And the point beyond that, then we get into the petitioning clause argument. And under this court's authority in SOSA versus DIRECTV, this court has clearly instructed that if a federal statute can be construed to avoid a constitutional issue, it should be. And it is only if that statute clearly prohibits the conduct at issue that the court would then take a decision as to whether the petitioning clause trumps the federal law. That's our argument here is that Section 7 does not specifically address subpoena directed to obtain records for use in an NLRB proceeding. And therefore, we contend that under the guidance of SOSA, this court should construe Section 7 as not prohibiting those types of subpoenas. Do you want to move to the firing of Maxino for union activity findings by the board? Well, in that regard, I think the first item that we would like to address has to do with Mr. Maxino's status as a supervisor at the time he was terminated. That was an argument that was given very short shrift by the administrative law judge in his decision. It was not treated at all by the board in its decision. And we contend that any fair reading of the record shows that substantial evidence does not support the administrative law judge's finding that Mr. Maxino was not a Section 211 supervisor at the time he was terminated. The ALJ looks at different things, some of which are not supported by the record, that are discussed in our opening brief. And he completely ignores the evidence relating to the stipulation entered into by the union and approved by the board that the charge nurses and relief charge nurses were Section 211 supervisors. The ALJ completely ignored the undisputed evidence that one of the individuals named in those stipulations was replaced by Mr. Maxino when she assumed the director position on March 15 of that year. And thereafter, he was the relief charge nurse for the emergency department, just as she was Cheryl Gilliott before that period of time. That's why Ms. Maxino is not, because Mr. Maxino assumed that role after the stipulation was entered into and approved by the board. Did the board make a credibility finding as to Gilliott? The administrative law judge did discredit her testimony with respect to what the duties are of the relief charge nurses. But in that regard, what we submit, and respectfully, is that shows the bias by the administrative law judge in that he reflexively Well, let's set aside the bias for a moment, because the issue that you were focusing on is that Maxino didn't engage in supervisory work. So to the extent that you're relying on and the ALJ discredits her testimony on deferential review, that's a pretty tough argument to make. We were relying on Gilliott's testimony with respect to the duties of a relief charge nurse. Those duties are also evidenced by the stipulation that was entered into by the union and approved by the board. That's evidence right there. So what the administrative law judge did is he didn't even mention those stipulations in his decision. He just, in a very conclusory fashion, said, I'm not going to credit anything that Gilliott said. And our point there is, when you look at the substantial evidence test, which requires that the court look at that evidence which is contrary to the board's findings, as well as the evidence that supports it, we contend that substantial evidence does not support the administrative law judge's finding with respect to Mr. Maxino's supervisory status. The ALJ and the board relied on the fact, and I'm talking about whether there was a pretextual reason offered, that the employer authorized him to basically use these files in order to defend yourself. Do you want to address that finding? Because I think that's one of the most compelling findings that really stands out, to say he could do it and then turn around and penalize him for that. That was their finding, but it is not supported by the evidence. And we discussed this in length in our brief. And, in fact, we even lay out all of the evidence that is undisputed that shows that it was not pretextual. Those include the documents. But most fundamentally, what we have in the record is a statement from Gilliott made on May 5. The finding by the administrative law judge with respect to the evidence, and the testimony from Mr. Maxino, was that on May 5, Gilliott gave him permission to view and to print the medical record. And our contention is, and that is why certainly his viewing of the medical record on that day was excused by CVMC. However, that's not why he was terminated. Had he just reviewed the record and printed it, which is what the judge found he was authorized to do on May 5, we wouldn't be here. Mr. Maxino would not have been terminated. He, thereafter, on several different occasions, again, reviewed the medical record, printed out the medical record, took the medical record off of the premises of the hospital, then submitted that medical record to Human Resources, even though Human Resources was not authorized to receive it. There is no evidence whatsoever in the record that would support a finding that he was authorized to use the medical record in that manner. The third point I wanted to address has to do with the extraordinary remedies that were made a part of the board's order in this case. We have cited for the court in our brief the law of this circuit, which establishes that if the board is going to impose extraordinary remedies, it's required to fully explicate why it is doing so and why its normal remedies will not suffice. And the board totally failed to do that in this case. The board itself doesn't even address the fact that the ALJ, sui sponte, without even being asked to do so by either the union or the NLRB general counsel, imposed a broad cease and desist order. Similarly, the ALJ imposed an order that not only requires the notice to employees to be read to employees, which is an extraordinary remedy, but that the notice be read either by an official of CVMC or in the presence of an official from CVMC. What authority from our circuit are you relying on that would be beyond the appropriate scope of a remedial order? The cases we are relying on with respect to the board being required to explain why an extraordinary remedy is ordered is the Gardner Mechanical case. We cited in our brief, and I believe that there are some others. This court, at least that I could find, has never squarely addressed the reading issue with respect to the punitive nature of the reading issue. There was some discussion in both of our briefs about that issue. In that regard, I do want to alert the court to a recent decision that was just issued by the D.C. Circuit. It's HTH Court v. NLRB, 823 Fed 3rd, 668. It was decided after the briefing was completed in this case. 823 F 3rd, 668. In that case, the D.C. Circuit discusses the IUE electrical case and the Teamsters 115 case, both of which are discussed in the party's brief. Where the D.C. Circuit came out with respect to that discussion is that the D.C. Circuit panel in Conair certainly overstepped its bounds in determining that a reading order was, in my words, not the court's words, presumptively appropriate. Here, though, we contend that in the circumstances of this case, we are not arguing that a reading remedy is never appropriate. What we are contending is that if there's going to be a reading requirement imposed, the board has to fully explain why its normal remedies won't work. That did not happen in this case. And as we discussed in our brief, the NLRB's decisions in this area before this one typically go into great length with respect to why a reading remedy is necessary. And it's typically in a situation where there's an element of recidivism. We don't have that in this case. There is no evidence that CBMC has ever been determined to have committed an unfair labor practice prior to the unfair labor practices found in this case. Do you want to save the remaining time for rebuttal? I do. Thank you. Thank you. Good morning, Your Honors. May it please the court, my name is Ryan Spillers. I represent the union in this case, the United Nurses Associations of California, Union of Healthcare Professionals, NUCHI, AFL-CIO. How are you spending time with the board? I'm going to take just five minutes, Your Honor. And the reason why is our appeal is very limited in this case. We challenge the board's failure to find unlawful and rescind a portion of Chino Valley Medical Center's employee handbook that limited employees' communications with the media. In all other respects, we agree with the board's decision and respectfully urge the court to enforce it. I'd like to start with what the board did find in this case, which is that the employer's chief medical officer made unlawful oral instructions to nurses that they could not contact the media. Counsel, you don't have a lot of time, and I think we're familiar with what the board did. I guess my question is a procedural one. The ALJ issues its decision and says, on due process grounds, I can't consider this written policy issue. And I understand the case law you've pointed us to, which says, no, actually, an ALJ can't if it's close enough. The question here is notice and it's close enough. This wasn't a shocker that you guys would want this resolved. But were those cases ever presented to the ALJ? So the ALJ says no due process or concern about due process. Did anyone say, hold on, time out, ALJ? Actually, you can. Here are the cases that let you do it. In our post-hearing brief, Your Honor, we did cite to Long's Drug Stores, California, Inc., 347 NLRB 500 from 2006. That is in this line of cases. We did cite additional authority in our briefing before this court. But the facts of that case are similar in that there were two provisions of a — there was a general confidentiality provision in an employee handbook that was alleged to be unlawful. And then there was a particular confidentiality provision that had to do with telling other coworkers about your wage rate. And the particular — that narrow provision was not found — was not alleged to be unlawful. But the board said, well, that provision gives meaning to the broader confidentiality provision that was explicitly challenged. And we're going to rescind it in order to effectuate an appropriate remedy. I saw actually my notes reflect that you did cite Long's Drugs. But high tech has that kind of — the language you guys like, understandably, is from high tech. Correct. Was that concept — it's well settled, you can do this — was that ever framed in the district court or to the ALJ? So the ALJ knew, hey, look, there is no due process problem here. That particular case and that standard was not cited in our post-hearing brief, Your Honor. If I may just address, since I have limited time, I would like to respond briefly to the employer's arguments about the supervisory status of Mr. Maxino. I would point out that the hospital relies heavily on this stipulation about the supervisory status of charge nurses. That stipulation does not support Mr. Maxino's supervisory status as an employer contends. That stipulation was signed on March 5th, 2010. Prior to that time, Mr. Maxino had been serving in a relief capacity as a charge nurse, but he was not explicitly named. There were individuals that were named in that stipulation as supervisors. He was not named in that stipulation, but yet he had been serving in that role on a relief basis. And, in fact, what the record evidence reflected, Your Honors, was that Mr. Maxino worked in that capacity more frequently before that stipulation than after. In February 2010, he worked approximately 10 times as a relief charge nurse. And then in the period between April and May, a two-month period, he worked about nine times as a relief charge nurse. So if his involvement as a relief charge nurse, which was more numerous, more significant, prior to the stipulation was not enough to qualify him as a supervisor, then certainly his diminished capacity in that role cannot qualify him as a supervisor. I would also point out that board law is clear on this matter, that there has to be clear evidence about the actual duties that the employee performed. The employer's witness was both discredited as not credible, but also because it was conclusory. And I believe my time is up, but thank you, Your Honors. Thank you. That was well done, by the way. You got it done in exactly five minutes. That's impressive. That's rare. I've never seen that before. Thank you. Thank you, Your Honors. Barbara Sheehy for the National Labor Relations Board. I'm just going to pick up quickly, I think, on the 211 issue, then I'll move into the pretext, unless the court has another idea. And then I was going to talk about the subpoenas, and then I'll sort of close, I think, with the remedial issues. But before getting into all of that, I just want to take one quick step back and make sure that everybody is aware of the uncontested violations in the case. We have upwards of a dozen uncontested violations. And I think it's important to remember that in the context of the entire case, that as we're talking about the discharge of Magsino and the other violations, that this is against the backdrop of an employer that has admitted and conceded 12 different violations. So I just wanted to start with that. That's context. We're aware of that. I know. I think it bears repeating, quite honestly, because I think, as you'll see, I think when we get back to the remedial issue, how that sort of ties into what the board did on its remedial. So I wanted to begin with that. But you're absolutely right. I'm certain the court's well aware of the conduct in the case. So talking quickly just about Magsino as a 211 supervisor. Again, as counsel for the union spoke to, that stipulation was signed on March 5, and it expressly listed individuals. So that is not relevant in terms – Magsino's not on that stipulation. And on top of that, it's the board's responsibility when somebody challenges the supervisory status of an employee or challenges the employee's status, it's for the board to decide whether that individual is a supervisor. So the fact that other individuals who shared a title that Magsino assumed on isolated occasions, that's not his job. He was not a relief charge nurse. In fact, if you look at his discharge papers, the very last piece of paper on May 20th, which is the employer's excerpts of the record at 794, his position is registered nurse. But going back to it's the board's responsibility to determine who's a supervisor and who's not. He is not on that stipulation, and it's not for the party – it's not for the parties to determine who's a supervisor. They stipulated to it. They had their reasons for the election to go forward. The fact remains Magsino is not on that. As of March 15th, yes, Gillotte served in a different capacity. But the administrative law judge made very clear that Magsino, among others, stepped into the breach of that position. Somebody had to fill that position when she was elevated to another. I mean, that's standard company – the hospital work must continue. She got into another position, and another charge nurse or relief charge nurse left the hospital. So you had two vacancies that were then being filled by a composite of employees, Magsino being one of them. We would take issue with this characterization that's repeated in the brief that he stepped into Gillotte's shoes, that he replaced Gillotte. What he did was, as his employer instructed, based on seniority, experience, and willingness to serve in that capacity, they ensured that the hospital function continued, and he served in that capacity in limited stints as needed by the hospital. And I would also add that there was no objection to anything that he did, any of his conduct, from March 15th going forward. And there was an objection hearing that we've heard from a little bit, where there was a main allegation in that, is that the election should be set aside on the basis of pro-union supervisory conduct. There were, I think, upwards of eight or nine supervisors that were litigated in that case, their conduct. And at no point during that, and that happened in June, June of the same year of the election, at no point did the employer cite to Magsino, up until his discharge, this employer never considered him a supervisor, never told him, hey, March 15th, you're a supervisor, stop doing things on behalf of the union. This was one of the most vocal union supporters on site. This employer knew how to tell its supervisors not to engage in pro-union supervisory conduct because they did it, and they litigated at the objections hearing. So there's absolutely no evidence that Magsino served as a supervisor, that they viewed him as a supervisor, or that he, in fact, engaged in supervisor activities, as opposed to, as I said, stepping into the breach when the hospital needed it because of staffing changes. Moving to the discharge, again, I would hear, I think that, as Your Honor pointed out, the pretext there is extraordinary. This is one of those cases where, when we talk about, was the employer able to show that it would have engaged in the same decision, absent the protected activity? And here you have two entirely similarly situated employees. You have De Santiago and you have Magsino. Both of them got brought under, they got sort of roped up in the whole HR process because of a random audit, where they were identified as nurses who engaged in patient, questionable patient treatment. They were both supervised by Gillott. She told both of them, view the record, or access the record, go ahead and print it. And then on top of that, there is credited testimony that Gillott, more than what she told to De Santiago, Gillott told Magsino, when she saw him working at the nurse's station, doing his, reviewing the record, she noticed that he was doing that and said, don't do that on work time, do that at home. The only difference between these two employees is that he did it at home, per his supervisor's instruction, and that obviously necessitated taking the document home to work on his grievance challenge at home, and then submitting that to HR. Now, the employer makes a big, tries to claim that this, these factual distinctions, the submission of the medical record information in pursuing his grievance challenge, that again, Gillott encouraged him to do. She encouraged both employees to challenge it. Magsino had no prior discipline for the five years of his employment at the hospital before the election. So then you have what they claim is the critical distinction, that he took it home in his backpack, and that he stapled a copy to HR. But I would point, and they said this makes all the difference in the world, but what they cannot answer for is in the excerpts of the record at 1125, is the internal report produced by the hospital. And that report, four pages long, is reporting on both de Santiago and Magsino. All of Magsino's conduct is in there, including taking it home and printing, I'm sorry, and stapling it to his HR. And the recommendation for both employees, with the full knowledge of everything that he did and the full knowledge of everything that she did, the recommendation there was to retrain and reeducate. That document shows that this hospital had no intention of firing Magsino because of what they perceived as HIPAA violations. So where the brief says that this was a dischargeable offense and he had to be fired because of this, their own documents show that they did not have an intention to do that. And then, getting back to, so you have the same intended discipline for the two similarly situated employees. And then you have what the actual forms were that they both received. And they both get written up for the same thing. And this is at 792 and 794 in the employer excerpts of the record. And you have, at the bottom of the two of those, has the employee been counseled to receive counseling for the same or similar action? For both employees, they list the initiating event of the patient treatment. So the May 4, whether the patient's vitals needed to be taken. That's listed on both forms. The only difference is, on Magsino, there's also not complying with the attendance policy. So query how that's a related offense to the HIPAA violation. Query how the patient treatment is a related HIPAA violation. Notwithstanding, and then on top of that, Jalot tells De Santiago, because De Santiago's concerned. She says, am I going to lose my job over this? I'm on a final written warning. And Jalot says, no, you're not going to be discharged for this, because it's not meeting the HIPAA violation. It's not a same or a similar offense. So to the extent that they're saying for Magsino it was same or similar, and I know the employer also points to the fact of this attendance thing, which I think is an even, I mean, that's even more attenuated from HIPAA violation. Two responses to that. One, as part of the uncontested violations, the change in the attendance policy is subject to rescission now. Those changes and the subsequent discipline to any employees is subject to rescission under the board's order. It's as if now that attendance policy violation does not exist. And on top of that, the second answer to that is, while it's not on De Santiago's sheet, De Santiago was also issued on the same day an attendance policy violation. Her individual performance improvement plan should have been as written identical to Magsino's. They both should have had the patient treatment, and they both should have had the attendance issue. And so here you have on hers, and I don't mean to imply that there's some, it could have just been an overset in there. What I'm saying is, had they been properly recorded, you would have had two identical sheets. You would have had an identical recommendation, and you have Magsino being discharged. The only difference between these employees is that he was the union movie star, as the employer saw. The employer did not want this union there, and that, I think, is an incredible showing of pretext in this case to show, even if you can show the HIPAA violations, and I think we'd argue that the evidence is just really unclear on that. It's unclear to what extent he was authorized to do everything that he did. To what extent does the employer have an internal grievance procedure that privileged this, or that the regulations allow? So even assuming they can prove that he violated HIPAA, I think the strong showing of, you could not hospital, you could not show that you would have fired him absent that violation, or absent the protected activity, sorry, because you didn't recommend it, and you didn't do it to the exactly same situated employee in DeSantiago. Can I have you move to addressing the written policy? Why shouldn't this panel remand for the board to address the written policy? What's the due process concern there? I think the due process concern is that it wasn't in the, it wasn't pled in the complaint. And the employer, I mean, there were multiple violations. Sure, but the ALJ could still address it if it's closely connected. It seems to have that close connection here. It was fully litigated. The employer isn't even challenging that part of it, so why shouldn't we remand for the board to address it now? I think a fair reading of the order now, as it relates to what the employer has to do affirmatively going forward on the media policy violation, subsumes any remedy that the board would order for the written policy violation. If you look at what the board ordered in terms of the, I thought I had it marked, in terms of the, in terms of the media policy, I don't know. But the written policy is still in place, right? Right, but it, So without a remand, it remains in place. Right, but a fair reading of the board's order I think calls into question whether or not that enforcement of the written policy, because it will conflict now. The board's order, if I remember it, and I can't find it. Oh. Sure, it gives rise to a question as to whether there will be a problem enforcing it. But it's still on the books, so I take it that what the union wants to do is to have that written policy and validate it, because it's really, part of the written policy is the same as the oral ban that the board has basically invalidated already. And I think arguably what the board's order here has done is prohibited this broad prohibition, or has forbidden the employer from saying there's a broad prohibition from speaking to the media. So to the extent that, so I don't know, if you look at what the written policy is, I don't know that on its face, if read now in the context of the board's order, that on its face it can't be reasonably and lawfully applied. So you have the board's order saying here's what you can't do, and then you have a written policy. So the argument will leave it alone because it's covered in part by the findings with regard to the oral ban anyway? I think so. To the extent that it's, to the extent that the board has an obligation to find a violation that's not pled in the complaint and that the general counsel didn't seek at the close of the hearing,  The general counsel who prosecuted the case did not ask for this finding. To the extent that if we get past that the administrative law judge had to do more than just say, I don't think that this was fully and fairly litigated, then I think naturally say, okay, well, is there a way then to avoid a remand in that, can you look at the written policy that, as Your Honor pointed out, is still on the books, but could it remain on the books in the context of this order and still be lawful? And I think if you read the board's order and the written policy together, I think the employer, I think a reasonable reading of that is the policy can still stand with the caveat that it can't be this broad prohibition. So I would say rather than remand, well, we would urge that... But it can't stand with regard to the portion that employees can't speak on behalf of employees, can it? I'm sorry? There's a portion of the written policy prohibiting the employees from contacting the media on behalf of other employees, so... Oh, I thought that... As written, can it stand? Or is your argument that it can still stand? That portions of it are now eviscerated by this finding, that the written policy, to the extent that it conflicts with this board order, that no, it would not stand. But there's another provision of it, I think, that as long as it's lawful, as long as it's implemented in the way that it's written... Part of it, that's fine. Right, that they can't be a spokesperson for the hospital. You're running short on time. Let me make sure that Judge Peterson doesn't have any questions for you. Absolutely. Oh, fine. Fine. Unless there were any... Oh, so I just want to make one quick point, I think, on the extraordinary remedies issue here, the public notice reading. The case that opposing counsel cited, the HTH case, I would urge the court to look at that. The D.C. Circuit just issued that in May. I was responsible for that case. And that case does not say that it is punitive. The D.C. Circuit stands by its law, which this circuit has also held in another HTH case, Pacific Beach Hotel is litigated in both circuits, that a public notice reading requirement is not punitive. So there's no holding in that... There's no suggestion in that case that it is a punitive remedy, particularly if there was a lot of discussion whether the insistence that another person fill into the shoes of the president, if that's... Like, the board agent could serve in that capacity. And then, unless there were any questions on the subpoenas, that was... No? All right. Obviously, we're seeking full enforcement. Thank you very much for your argument. Thank you. Thank you. On that last point, when you read the case, you'll see that the decision does not say that a reading is punitive. The point is, it can be punitive. It is not punitive in all circumstances. And that's our argument here, and I think that's consistent with HTH. With respect to the subpoena issue, I did want to, again, point the court to... It's in the record, the employer's excerpts at 1024 to 1047. You'll see documents that were responsive to the subpoena items that underlie the board's order here. And our point is that, to the extent the subpoenas were overbroad, they cannot be a ULP just by virtue of the fact that they were overbroad, particularly given the in-camera direction in those subpoenas. With respect to the pretext issue, I can't articulate anything in front of you, I hope, as well as I did in my brief. And I would just ask you to take a look again at pages 48 to 57 of our opening brief, where the pretext issue is discussed at length with the evidentiary sites. With respect to the Section 211 issue on Mr. Maxino, it is true that he worked occasional shifts as a relief charge prior to March 15, but the point is, and the evidence is, in this record, is that he did take over for Gilliat, take over that relief charge role after she was promoted on March 15. I would also note that the testimony with respect to what he did in February as a relief charge was in some tangential questioning of another witness on a different issue. All right. Thank you very much, Counsel. Both sides for your argument.
judges: Pregerson, Nguyen, Owens